UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 Case |
| Scheherazade, Inc., | ) |
| | ) Case No. 10-42100-GFK |
| Debtor. | ) |
| | ) |

**SECOND MODIFIED PLAN OF REORGANIZATION
DATED OCTOBER 25, 2010**

Debtor, Scheherazade, Inc., hereby proposes the following Plan of Reorganization pursuant to the provisions of Chapter 11 of the Bankruptcy Code.

ARTICLE I

DEFINITIONS

A. <u>Defined Terms</u>.

The following terms shall have the respective meanings hereinafter set forth. Any terms contained in this Plan that are not specifically defined shall have the meaning provided for in the Bankruptcy Code, unless the context otherwise requires.

1.1 "Administrative Expenses" means Claims allowed under § 503(b) and § 507(a)(1) of the Bankruptcy Code and fees and charges assessed against a Debtor's estate under 29 U.S.C. § 1930.

1.2 "Allowed Claim," "Allowed Secured Claim," "Allowed Priority Claim" or "Allowed Unsecured Claim" mean, respectively, a Claim, Secured Claim, Priority Claim, or Unsecured Claim against Debtor to the extent that:

(a) a proof of such Claim was

(i) timely filed;

(ii) deemed filed pursuant to § 1111 (a) of the Bankruptcy Code; or

(iii) late filed with leave of the Bankruptcy Court after notice and opportunity for hearing given to counsel for Debtor and the Creditors' Committee appointed in this Chapter 11 case; and

(b) (i) which is not a Disputed Claim; or

(ii) which is allowed (and only to the extent allowed) by a Final Order.

1.3 "Bankruptcy Code" means Title 11 of the United States Code, as amended.

1.4 "Bankruptcy Court" means the United States Bankruptcy Court for the District of Minnesota or, in the event such court ceases to exercise jurisdiction over this Chapter 11 case, the Court having jurisdiction over this Chapter 11 case.

1.5 "Business Day" means any day other than a Saturday, Sunday, or a day on which banking institutions in the State of Minnesota are not open to conduct business.

1.6 "Cash" means Cash and Cash equivalents including, but not limited to, bank deposits, checks, and other similar items.

1.7 "Claim" means a claim as such term is defined in § 101 (4) of the Bankruptcy

Code.

1.8 "Claimant" means the holder of a Claim.

1.9 "Claims Bar Date" means such date as established by the Bankruptcy Court or applicable bankruptcy rule as the last day to file a Claim.

1.10 "Confirmation Date" means the date on which the Confirmation Order is entered.

1.11 "Confirmation Order" means the Order of the Bankruptcy Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code.

1.12 "Debtor" means Scheherazade, Inc.

1.13 "Disclosure Statement" means the Disclosure Statement that is approved by the Bankruptcy Court after notice and hearing and which accompanies this Plan.

1.14 "Disputed Claim" means a Claim asserted against a Debtor (i) to which an objection has been filed, or (ii) which has been scheduled as disputed, contingent or unliquidated and which has been resolved or allowed by Final Order, estimation or pursuant to this Plan.

1.15 "Distributions" mean, as the context may require, the Cash, notes or property required by the Plan to be distributed to the holders of Allowed Claims, or any Distribution thereof to such parties.

1.16 "Effective Date" means the tenth day following the date on which a Final Order confirming this Plan is entered.

1.17 "Filing Date" means March 24, 2010.

1.18 "Final Order" means an Order of the Bankruptcy Court as to which (a) any appeal that has been taken has been finally determined or dismissed; (b) the time for appeal has expired and no notice of appeal has been filed.

1.19 "Interest" means the shareholder interest of any shareholder in Debtor.

1.20 "Plan" means this Debtor's Plan of Reorganization, as the same may be amended or modified.

1.21 "Reorganized Debtor" means the Debtor following the Confirmation Date.

1.22 "Schedules" means the schedules of assets and liabilities of Debtor on file with the Clerk of Bankruptcy Court for the District of Minnesota, as from time to time amended in accordance with Bankruptcy Rule 1009.

1.23 "Secured Claim" means any Claim in respect of which a valid lien, security

interest or encumbrance is held in any assets of Debtor.

1.24   "Unsecured Claims" mean all unsecured non-priority Allowed Claims against Debtor, including any deficiency claim of the holder of a Secured Claim and any Claim arising from the rejection of any executory contract or unexpired lease of the Debtor. Unsecured Claims do not include any deficiency Claim of the holder of a Secured Claim if said Claim is non-recourse and the security is sold or tendered to the holder of the Secured Claim.

B.   Undefined Terms.

A term used and not defined herein which is defined in the Bankruptcy Code shall have the term defined therein, unless the context clearly requires otherwise. A term not defined herein nor defined in the Bankruptcy Code shall have its normal meaning, unless the context clearly requires otherwise.

## ARTICLE II

## ADMINISTRATIVE AND PRIORITY CLAIMS

2.1   Except as provided in Section 2.2 of the Plan, Allowed Administrative Claims shall be paid in full in cash on the Effective Date or shall be paid in accordance with such terms as may have been or may be agreed upon by the Debtor and the respective claimants.

2.2   All trade and service debts and all other obligations incurred in the normal course of business by the Debtor in the conduct and operation of its business between the Filing Date and the Confirmation Date shall be paid in full when due in the ordinary course, according to their terms.

2.3   The quarterly fees paid to the United States Trustee pursuant to 28 U.S.C. 1930(a)(6) which become due during the pendency of the case will be paid in full in the ordinary course. Fees payable by the Debtor under 28 U.S.C. §1930 shall be paid in full on the Effective Date and thereafter as and when due until the Chapter 11 case is closed, dismissed or converted. After confirmation, the Debtor shall submit quarterly operating reports to the United States Trustee each quarter (or portion thereof) until the Chapter 11 case is closed, dismissed or converted. Such reports shall be in the format prescribed by the United States Trustee.

2.4   Allowed Priority Claims under Section 507(a)(2)-(7) of the Code shall be paid in full in cash on the Effective Date or shall be paid in accordance with such terms as may have been or may be agreed upon by the Debtor and the respective claimants. Unless otherwise agreed, each holder of an Allowed Priority Claim under Section 507(a)(8) of the Code shall receive monthly periodic payments in an amount sufficient to fully amortize its Allowed Priority Claim payable over a period of six (6) years from the most recent date of assessment of such Allowed Priority Claim, bearing interest at the rate of 6% per annum.

2.5   Executory contracts and unexpired leases which are assumed shall be paid in accordance with their original terms or in accordance with such terms as may have been agreed upon between the Debtor and the respective parties thereto.

ARTICLE III

TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The Debtor's Plan of Reorganization has the following classified claims and interest:

A.  Description and Treatment of Classes of Claims.

    3.1  Class A: Secured Claims.

        3.1.1  Class A-1. Class A-1 consists of the Allowed Secured Claim of Bank of America (**"Bank"**) estimated to be $582,000 plus post-petition attorneys' fees and expenses, if any, to which Bank may be entitled to receive under its pre-petition agreements with the Debtor. Except as provided in the cash collateral stipulation between the Debtor and the Bank dated August 20, 2010, all rights of the Debtor to object to any post-petition charges assessed by Bank including post-petition attorneys' fees and expenses are expressly reserved.

Treatment of Class A-1: In full satisfaction of Bank's Allowed Secured Claim, Bank shall receive the following treatment:

(a) Bank shall retain its pre-petition security interests;

(b) Bank shall receive a cash payment on the Effective Date of $200,000.00 that shall be applied to principal (**"Effective Date Payment"**);

(c) Bank shall also receive (i) a principal payment of $50,000.00 on November 1, 2010 or if the Effective Date has not by then occurred, then such November 1, 2010 payment shall be made pursuant to a stipulation for use of cash collateral, and (ii) a principal payment of $50,000.00 on December 1, 2010 (the **"Principal Payments"**);

(d) Bank shall receive monthly payments of interest only computed on the non-default rate provided in the Bank's loan documents on the balance of its Allowed Secured Claim remaining (after crediting the Principal Payments and the Effective Date Payment), which interest payments shall commence on the first day of the first full calendar month following the Effective Date and continue on the first day of each month thereafter;

(e) The balance of Bank's Allowed Secured Claim shall be paid in full in cash on or before December 31, 2010; and

(f) Prior to the Effective Date, the Debtor shall enter into amended loan documents mutually agreeable to the Debtor and the Bank whereby the existing revolving loan is converted to a simple term loan  The documents shall take effect on the Effective Date.

Class A-1 is impaired.

Class B:  Secured Claims of Pre-petition Consignors for Sold Consignment Goods.

Class B contains classes and treatment for creditors:  (i) who provided inventory to the Debtor pre-petition on consignment or memo; (ii) who properly perfected their interests by filing UCC financing statements; and (iii) some of whose consigned goods were sold by the Debtor pre-petition without paying the consignment price for the sold goods.  All other creditors who (i) provided inventory to the Debtor pre-petition on consignment or memo and (ii) *did not* properly perfect their interests by filing UCC financing statements are treated as unsecured creditors in Class D.

Class B-1:  Class B-1 consists of the Allowed Secured Claim of D'Annunzio Distribution, Inc. and/or D'Annunzio Showcase Dealers, Inc. ("**D'Annunzio**") for consigned goods sold by the Debtor pre-petition without paying the consignment price in an amount estimated to be $56,000.  D'Annunzio consigned goods to the Debtor pre-petition and had properly perfected its interest in the consigned goods by filing a UCC financing statement and giving notice of intent to claim a purchase money security interest to Bank.  The Debtor sold some of the goods consigned by D'Annunzio and instead of paying the consignment price to D'Annunzio, the proceeds of the sales were paid to the Bank to reduce Bank's secured claim.  By operation of law, D'Annunzio became subrogated to the secured claim of Bank in an amount equal to the consignment price[s] paid to the Bank.  D'Annunzio holds a security interest in the same property as the Bank.

Treatment of Class B-1:  In full satisfaction of its Allowed Secured Claim in Class B-1, D'Annunzio shall receive the following treatment:

Commencing January 15, 2011, the Debtor shall pay D'Annunzio 40 consecutive quarterly payments in an amount equal to $1/40^{th}$ of D'Annunzio's Allowed Claim or more without interest provided, however, that the Allowed Secured Claim of Bank of America shall have been paid in full before any payments commence.  Quarterly payments shall be made on each January 15, April 15, July 15 and October 15.

Class B-1 is impaired.

Class B-2:  Class B-2 consists of the Allowed Secured Claim of LDM Company ("**LDM**") for consigned goods sold by the Debtor pre-petition without paying the consignment price in an amount estimated to be $174,000.  LDM consigned goods to the Debtor pre-petition and had properly perfected its interest in the consigned goods by filing a UCC financing statement and giving notice of intent to claim a purchase money security interest to Bank.  The Debtor sold some of the goods consigned by LDM and instead of paying the consignment price to LDM, the proceeds of the sales were paid to the Bank to reduce Bank's secured claim.  By operation of law, LDM became subrogated to the secured claim of Bank in an amount equal to the consignment price[s] paid to the Bank.  LDM holds a security interest in the same property as the Bank.

Treatment of Class B-2:  In full satisfaction of its Allowed Secured Claim in Class B-2, LDM shall receive the following treatment:

Commencing January 15, 2011, the Debtor shall pay LDM 40 consecutive quarterly payments in an amount equal to $1/40^{th}$ of LDM's Allowed Claim or more without interest provided, however, that the Allowed Secured Claim of Bank of America shall have been paid in full before any payments commence. Quarterly payments shall be made on each January 15, April 15, July 15 and October 15.

Class B-2 is impaired.

Class B-3: Class B-3 consists of the Allowed Secured Claim of Honora Industries, Inc. ("**Honora**") for consigned goods sold by the Debtor pre-petition without paying the consignment price in an amount estimated to be $18,000. Honora consigned goods to the Debtor pre-petition and had properly perfected its interest in the consigned goods by filing a UCC financing statement and giving notice of intent to claim a purchase money security interest to Bank. The Debtor sold some of the goods consigned by Honora and instead of paying the consignment price to Honora, the proceeds of the sales were paid to the Bank to reduce Bank's secured claim. By operation of law, Honora became subrogated to the secured claim of Bank in an amount equal to the consignment price[s] paid to the Bank. Honora holds a security interest in the same property as the Bank.

Treatment of Class B-3: In full satisfaction of its Allowed Secured Claim in Class B-3, Honora shall receive the following treatment:

Commencing January 15, 2011, the Debtor shall pay Honora 40 consecutive quarterly payments in an amount equal to $1/40^{th}$ of Honora's Allowed Claim or more without interest provided, however, that the Allowed Secured Claim of Bank of America shall have been paid in full before any payments commence. Quarterly payments shall be made on each January 15, April 15, July 15 and October 15.

Class B-3 is impaired.

Class B-4: Class B-4 consists of the Allowed Secured Claim of Gumuchian Fils, Ltd. ("**Gumuchian**") for consigned goods sold by the Debtor pre-petition without paying the consignment price in an amount estimated to be $10,210. Gumuchian consigned goods to the Debtor pre-petition and had properly perfected its interest in the consigned goods by filing a UCC financing statement. The Debtor sold the goods consigned by Gumuchian and instead of paying the consignment price to Gumuchian, the proceeds of the sales were paid to the Bank to reduce Bank's secured claim. By operation of law, Gumuchian became subrogated to the secured claim of Bank in an amount equal to the consignment price[s] paid to the Bank. Gumuchian holds a security interest in the same property as the Bank.

Treatment of Class B-4: In full satisfaction of its Allowed Secured Claim in Class B-4, Gumuchian shall receive the following treatment:

Commencing January 15, 2011, the Debtor shall pay Gumuchian 40 consecutive quarterly payments in an amount equal to $1/40^{th}$ of Gumuchian's Allowed Claim or more without interest provided, however, that the Allowed Secured Claim of Bank of America shall have been paid in

full before any payments commence.  Quarterly payments shall be made on each January 15, April 15, July 15 and October 15.

Class B-4 is impaired.

Class B-5:  Class B-5 consists of the Allowed Secured Claim of Prime Diam Co. ("**Prime Diam**") for consigned goods sold by the Debtor pre-petition without paying the consignment price in an amount estimated to be $17,986.00.  Prime Diam consigned goods to the Debtor pre-petition and had properly perfected its interest in the consigned goods by filing a UCC financing statement.  The Debtor sold the goods consigned by Prime Diam and instead of paying the consignment price to Prime Diam, the proceeds of the sales were paid to the Bank to reduce Bank's secured claim.  By operation of law, Prime Diam became subrogated to the secured claim of Bank in an amount equal to the consignment price[s] paid to the Bank.  Prime Diam holds a security interest in the same property as the Bank.

Treatment of Class B-5:  In full satisfaction of its Allowed Secured Claim in Class B-5, Prime Diam shall receive the following treatment:

Commencing January 15, 2011, the Debtor shall pay Prime Diam 40 consecutive quarterly payments in an amount equal to $1/40^{th}$ of Prime Diam's Allowed Claim or more without interest provided, however, that the Allowed Secured Claim of Bank of America shall have been paid in full before any payments commence.  Quarterly payments shall be made on each January 15, April 15, July 15 and October 15.

Class B-5 is impaired.

Class B-6:  Class B-6 consists of the Allowed Secured Claim of K. Takahashi & Co. ("**Takahashi**") for consigned goods sold by the Debtor pre-petition without paying the consignment price in an amount estimated to be $4,805.00.  Takahashi consigned goods to the Debtor pre-petition and had properly perfected its interest in the consigned goods by filing a UCC financing statement.  The Debtor sold the goods consigned by Takahashi and instead of paying the consignment price to Takahashi, the proceeds of the sales were paid to the Bank to reduce Bank's secured claim.  By operation of law, Takahashi became subrogated to the secured claim of Bank in an amount equal to the consignment price[s] paid to the Bank. Takahashi holds a security interest in the same property as the Bank.

Treatment of Class B-6:  In full satisfaction of its Allowed Secured Claim in Class B-6, Takahashi shall receive the following treatment:

Commencing January 15, 2011, the Debtor shall pay Takahashi 40 consecutive quarterly payments in an amount equal to $1/40^{th}$ of Takahashi's Allowed Claim or more without interest provided, however, that the Allowed Secured Claim of Bank of America shall have been paid in full before any payments commence.  Quarterly payments shall be made on each January 15, April 15, July 15 and October 15.

Class B-6 is impaired.

Class B-7: Class B-7 consists of the Allowed Secured Claim of Ritani, LLC (**"Ritani"**) for consigned goods sold by the Debtor pre-petition without paying the consignment price in an amount estimated to be $540.00. Ritani consigned goods to the Debtor pre-petition and had properly perfected its interest in the consigned goods by filing a UCC financing statement. The Debtor sold the goods consigned by Ritani and instead of paying the consignment price to Ritani, the proceeds of the sales were paid to the Bank to reduce Bank's secured claim. By operation of law, Ritani became subrogated to the secured claim of Bank in an amount equal to the consignment price[s] paid to the Bank. Ritani holds a security interest in the same property as the Bank.

Treatment of Class B-7: In full satisfaction of its Allowed Secured Claim in Class B-7, Ritani shall receive the following treatment:

> Commencing January 15, 2011, the Debtor shall pay Ritani 40 consecutive quarterly payments in an amount equal to $1/40^{th}$ of Ritani's Allowed Claim or more without interest provided, however, that the Allowed Secured Claim of Bank of America shall have been paid in full before any payments commence. Quarterly payments shall be made on each January 15, April 15, July 15 and October 15.

Class B-7 is impaired.

Class B-8: Class B-8 consists of the Allowed Secured Claim of Star 129, Inc. (**"Star"**) for consigned goods sold by the Debtor pre-petition without paying the consignment price in the amount of $100.00. Star consigned goods to the Debtor pre-petition and had properly perfected its interest in the consigned goods by filing a UCC financing statement. The Debtor sold the goods consigned by Star and instead of paying the consignment price to Star, the proceeds of the sales were paid to the Bank to reduce Bank's secured claim. By operation of law, Star became subrogated to the secured claim of Bank in an amount equal to the consignment price[s] paid to the Bank. Star holds a security interest in the same property as the Bank.

Treatment of Class B-8: In full satisfaction of its Allowed Secured Claim in Class B-8, and in light of the *de minimus* size of Star's Allowed Secured Claim, as a matter of administrative convenience Star shall receive the following treatment:

> Cash payment of $100.00 on the Effective Date. Class B-8 is unimpaired.

Class C: Secured Claims of Perfected Consignors in Goods Unsold on the Petition Date.

Class C contains classes and treatment for four creditors (the **"Class C Claimants"**): (i) who provided inventory to the Debtor pre-petition on consignment or memo; (ii) who properly perfected their interests by filing UCC financing statements; and (iii) some of whose consigned goods remained unsold by the Debtor on the Petition Date. The respective amounts of the holders of claims in Class C are measured by the consignment prices for the unsold goods. Holders of Claims in Class C have purchase money security interests in the specific goods consigned. Three creditors in this class, D'Annunzio, LDM and Honora are subject to the Court's order of June 29, 2010 and have received payment of the consignment price for consigned goods sold during the pendency of the Chapter 11.

9

All other creditors who (i) provided inventory to the Debtor pre-petition on consignment or memo and (ii) *did not* properly perfect their interests by filing UCC financing statements are treated as unsecured creditors in Class D.

Class C-1: Class C-1 consists of the Allowed Secured Claim of D'Annunzio Distribution, Inc. and/or D'Annunzio Showcase Dealers, Inc. (**"D'Annunzio"**) measured by the consignment prices for consigned goods provided by D'Annunzio but unsold on the Petition Date in an amount estimated to be $271,820.00. D'Annunzio holds a perfected purchase money security interest in these unsold consigned goods.

Treatment of Class C-1: In full satisfaction of its Allowed Secured Claim in Class C-1, D'Annunzio shall receive the "Class C Treatment" as that term is defined below.

Class C-2: Class C-2 consists of the Allowed Secured Claim of LDM Company (**"LDM"**) measured by the consignment prices for consigned goods provided by LDM but unsold on the Petition Date in an amount estimated to be $160,355.00. LDM holds a perfected purchase money security interest in these unsold consigned goods.

Treatment of Class C-2: In full satisfaction of its Allowed Secured Claim in Class C-2, LDM shall receive the "Class C Treatment" as that term is defined below.

Class C-3: Class C-3 consists of the Allowed Secured Claim of Honora Industries, Inc. ("**Honora**") measured by the consignment prices for consigned goods provided by Honora but unsold on the Petition Date in an amount estimated to be $22,236.00. Honora holds a perfected purchase money security interest in these unsold consigned goods.

Treatment of Class C-3: In full satisfaction of its Allowed Secured Claim in Class C-3, Honora shall receive the "Class C Treatment" as that term is defined below.

Class C-4: Class C-4 consists of the Allowed Secured Claim of K. Takahashi & Co., Inc. (**"Takahashi"**) measured by the consignment prices for consigned goods provided by Takahashi but unsold on the Petition Date in an amount estimated to be $120,608.00. Takahashi holds a perfected purchase money security interest in these unsold consigned goods.

Treatment of Class C-4: In full satisfaction of its Allowed Secured Claim in Class C-4, Takahashi shall receive the "Class C Treatment" as that term is defined below.

Definition of Class C Treatment. "Class C Treatment" shall mean:

**1.** **Retention of Security Interest**. The Class C Claimants shall retain their pre-petition security interests.

**2.** **Warranty of Merchantability**. Class C Claimants shall warrant the merchantability of all consigned goods and shall assign any manufacturer's warranty to the buyer of any consigned goods to the extent applicable.

3. **Ownership of Consigned Goods**. Debtor shall treat ownership and title to the consigned goods as remaining with the respective Class C Claimant notwithstanding the fact that some or all of the consigned goods may have been consigned to such Class C Claimant by third parties, provided, however, that while the consigned goods are in the Debtor's possession, the Debtor is deemed to have rights and title to the consigned goods identical to those the respective Class C Claimant had or had power to transfer as provided by Minn. Stat. § 336.9-319(a), including the right to sell the consigned goods to Debtor's customers and deliver title to the consigned goods in the ordinary course of Debtor's business. Class C Claimant warrants that notwithstanding the fact that some or all of the consigned goods may have been previously consigned to such Class C Claimant by third parties, such Class C Claimant has title to and the right to sell the consigned goods and to deliver title thereto. Class C Claimant shall indemnify and hold the Debtor and the buyer of any consigned goods harmless from all claims by any consignor of goods to Class C Claimant, including any attorneys' fees incurred by Debtor or buyer in defending against such claims.

4. **Debtor's Obligations for Insurance and Care of Consigned Goods**. Debtor shall carry insurance in an amount and on terms customary in the retail jewelry business, with coverage terms and limitations such as are necessary to ensure that the consigned goods will be covered to the same extent as any and all other inventory held by Debtor. Upon request by a Class C Claimant, Debtor shall provide a certificate of insurance naming such Class C Claimant as an additional insured party. Debtor shall use all commercially reasonable efforts to care for, protect, and display the consigned goods in a manner consistent with Debtor's practice with respect to other inventory. Debtor shall keep all consigned goods, except those sent elsewhere for repair or sizing, at its retail store location. Debtor shall provide written notice of Debtor's intent to move the location of any consigned goods to another location at least ten (10) days prior to the expected move.

5. **Use of Proceeds of Sales of Consigned Goods**. Debtor shall have the right to sell the consigned goods to retail customers in the ordinary course of business and shall immediately upon receipt of payment for the sale of any item of consigned goods, deposit the amount of consignment price for such sold goods into an escrow account maintained by Debtor for that purpose. Any amount paid to Debtor in excess of the consignment price may be retained and used by Debtor and will not be deposited into the escrow account.

6. **Reporting of Sales of Consigned Goods and Payment**. Debtor shall provide each Class C Claimant on or before the 10th day of the month a written report of the sale of any item of consigned goods provided by such Class C Claimant made during the preceding calendar month (the **"Monthly Consignment Sales Report"**). With the Monthly Consignment Sales Report, Debtor shall remit to such Class C Claimant the consignment price[s] for all items of consigned goods identified on the Monthly Consignment Sales Report as having been sold in the preceding month. Debtor shall have no obligation to account to Class C Claimant for any proceeds of the sales of Consigned Goods in excess of the consignment price or to disclose to such Class C Claimant the price Debtor obtained for the sale of any consigned goods. Debtor reserves the right to purchase any consigned goods from any Class C Claimant at any time by paying such Class C Claimant the consignment price for such item[s].

7. **Payments.** In the event that any payment due from Debtor to any Class C Claimant pursuant to this agreement is not received by such Class C Claimant as provided for hereunder, then in

addition to all other rights and remedies available to Class C Claimant under law and hereunder, Class C Claimant shall be entitled to be paid a service charge by Debtor not to exceed 18% per annum (but in no event to exceed the maximum allowable rate under applicable law) on the unpaid balance due such Class C Claimant from Debtor.

8. **Return of Consigned Goods**. Debtor may return consigned goods or any part thereof to the Class C Claimant from whom such goods were obtained at any time. Such returns shall be made by UPS overnight or second day delivery at Debtor's expense. Debtor shall insure the returned items with UPS in an amount equal to the consignment price. Upon shipment, Debtor shall have no further obligation to pay for or insure the returned goods. Any Class C Claimant may, upon thirty (30) days prior written notice to Debtors, demand the return of any or all consigned goods provided by such Class C Claimant then in possession of Debtor which are not then under contract to a buyer. Upon expiration of the thirty (30) days notice, Debtor shall, or at Debtor's option sooner may, return such goods to such Class C Claimant in the manner described in this paragraph. Upon shipment, Debtor shall have no further obligation to pay for or insure the returned goods. Notwithstanding the foregoing, any Class C Claimant shall have the right to remove from consignment one or more items of consigned goods by notifying Debtor that such Class C Claimant has received an offer from a third party merchant for the purchase of such item or items and upon providing evidence to Debtor of such offer. In such event, such Class C Claimant agrees to notify Debtor of such offer, and Debtor agrees to either (i) make such item or items available to the Class C Claimant within one business day, or, (ii) upon Class C Claimant's request, process the return of the item to Class C Claimant in the same manner provided in this paragraph within one business day of such request, or (iii) Debtor may elect to purchase such item by wiring the consignment price for such item to the Class C Claimant within one business day of the Debtor's receipt of evidence of such offer from Class C Claimant, or at Debtor's option may transmit a check for the consignment price to such Class C Claimant in the same manner provided in this paragraph.

9. **Inspections.** Upon ten (10) days advance written notice, Debtor agrees to permit any Class C Claimant to view the consigned goods provided by such claimant, or to undertake a physical inventory of the same, provided that such inspection or inventory shall only be permitted during normal business hours, and shall be undertaken in such a manner as to minimize any disruption of Debtor's business. All costs and expenses of such inspection or inventory shall be borne by such Class C Claimant.

10. **Missing or Damaged Consigned Goods**. In the event that an inspection or inventory undertaken by any Class C Claimant reveals that any of the consigned goods provided by such Class C Claimant are either missing, unaccounted for, or materially damaged while in Debtor's possession, Debtor shall remit to such Class C Claimant an amount equal to the consignment price for all such items with the next Monthly Consignment Sales Report.

11. **Default.** In the event of any default by Consignee under this Consignment Agreement, including the failure to keep accurate and complete records with respect to the Consigned Goods, the failure to notify Consignor of any loss or damage to the Consigned Goods, the failure to maintain insurance in amount sufficient to insurance against risk of loss to the Consigned Goods, or in the event of the failure to pay any amount as and when due under the Consignment Agreement, then in such event Consignor will be entitled to the immediate return of its Consigned Goods. Consignor agrees to give Consignee notice of any such default by mailing a copy of such notice to Consignee's address by U.S.

Mail, postage prepaid or, by facsimile or e-mail. Upon Consignor sending such notice, Consignee shall have no further right to sell any of the Consigned Goods, and Consignee agrees to assemble all of Consignor's Consigned Goods and make them available to Consignor. In the event legal process becomes necessary to enforce Consignor's rights hereunder, Consignee agrees that in addition to Consignee's obligations to pay for any Consigned Goods sold by it under paragraphs 6 and 7 hereof, Consignee shall be responsible for Consignor's reasonable attorney's fees in enforcing this Agreement. Consignee further agrees and does hereby waive, to the fullest extent permitted by law, any requirement of notice, or any requirement that Consignor post a bond for the return of its Consignment Goods.

Class C is impaired.

Class D: Unsecured Claims.

This Class consists of the Claims of Debtor's Unsecured Creditors. Class D also includes the claims of all Unperfected Consignors including OMI Gems, Inc.; Stardust Diamond Corp.; Kalbe Associates, Inc.; EJ Diamonds, Inc.; Michael Couch & Assoc.; CITRA; Carl F. Bucherer; Hearts on Fire; WLH, Ltd.; and Yourline, Inc. The Debtor estimates that the Claims in this category total $1,686,000.

In full satisfaction of the Allowed Unsecured Claims in Class D, the claimants in Class D shall receive: (a) their prorata share of a one-time cash payment of $56,385.00 to be made on or before February 28, 2011; and (b) their prorata share of deferred cash payments without interest of $18,795 per quarter commencing on the 15th day of the first month in the second calendar quarter following the Effective Date and continuing on the 15th day of each successive first month of each successive quarter in the succeeding calendar quarters until the Debtor has paid a total of $300,720 provided, however, that the Allowed Secured Claim of Bank of America shall have been paid in full before any payments commence.

Class D is impaired.

Class E: Shareholder Interests.

This Class consists of the interests in the Debtor held by the holders of the Debtor's common stock. All common stock will be cancelled on the Effective Date.

On the Effective Date, the Debtor will issue 51 shares of new common stock to Scott Rudd and 49 shares to Marilyn Rudd in exchange for a cash payment on the Effective Date of $200,000.00. The $200,000 is presently held in 401k plan[s] or IRA's owned by the Rudds.

Class E is impaired.

ARTICLE IV

CLASSES OF CLAIMS AND INTERESTS IMPAIRED UNDER PLAN

4.1 All Classes are impaired under the Plan and are entitled to vote on the Plan.

## ARTICLE V

## GENERAL PROVISIONS

5.1  Payments under this Plan will be made by check, mailed with first class postage prepaid, to the Claimant at the address listed on its Proof of Claim or, if no proof of claim has been filed by the date of the hearing on confirmation, to the address listed on the Schedules.

5.2  Payments and other distributions under this Plan will be made as soon as practicable on or following the Effective Date, except as otherwise specified in this Plan.

5.3  In the event a payment is returned to Debtor unclaimed, with no indication of Claimant's forwarding address, Debtor will hold such payment for a period of six months from the date of return. If not claimed by the Claimant by the end of that period, the payment shall become the property of Debtor.

5.4  In the event this Plan is not confirmed under Bankruptcy Code § 1129(a), Debtor requests that this Plan be confirmed under Bankruptcy Code § 1129(b).

5.5  Debtor reserves and retains the right after confirmation to pursue any claims against third parties, including preference and fraudulent transfers.

5.6  Debtor shall have the right to prepay any obligation under this Plan without penalty.

5.7  The Debtor is pursuing a Plan to continue its business operations subsequent to approval of this Plan of Reorganization. The Debtor anticipates no adverse tax consequences as a result of the Court confirming the Plan of Reorganization.

## ARTICLE VI

## MEANS FOR EXECUTION OF PLAN

6.1  On the Effective Date, Scott and Marilyn Rudd shall contribute $200,000 to the Debtor in exchange for 100 shares of newly issued common stock and a release by the Debtor of a loan to shareholder carried on the Debtor's books at $113,649.  The Rudds will waive all claims against the estate.  Existing stock will be cancelled.  The $200,000 of new money shall be used to make the $200,000 payment to the Bank due on the Effective Date.  The balloon payment to Bank due on December 31, 2010 will come from: (i) a short-term secured loan or loans to the Debtor provided by Scott and Marilyn Rudd; (ii) new financing to the Debtor provided by a lender other than Scott and Marilyn Rudd; (iii) cash of the Debtor; or (iv) a combination of (i) through (iii).

All other payments shall come from cash of the Debtor or, in the case of deferred payments, future cash flow of the Debtor. In the event that (i) the $200,000 to be paid to the Debtor by Scott and Marilyn Rudd and paid to the Bank on or before the Effective Date, or (ii) the Debtor fails to repay Bank the full amount of its Allowed Secured Claim on or before December 31, 2010, then the Debtor shall

immediately retain Gordon Brothers Group to commence as soon as practicable an orderly liquidation of the Debtor's inventory. The liquidation sale shall commence within ten (10) days of the non-payment of either of the items in (i) or (ii) above. In the event that (a) the liquidation sale does not commence within such ten (10) days; (b) the Bank's Allowed Secured Claim is not paid in full within sixty (60) days from the commencement of the liquidation sale; or (c) the liquidation sale is terminated prior to payment in full of the Bank's Allowed Secured Claim; then the Bank may exercise its available remedies under its loan documents, as amended, and applicable law. Proceeds from the sale of the inventory, after the costs of the sale, shall be distributed by the Debtor in conformity with the priorities set forth in the Bankruptcy Code. Any party in interest may move the court to replace Gordon Brothers as the liquidating agent upon a showing of willful misconduct or gross negligence by Gordon Brothers. Nothing herein shall be construed as prohibiting the Debtor from converting the case to a Chapter 7.

ARTICLE VII

EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 During the pendency of the case, the Debtor did not assume any leases or executory contracts.

7.2 On the Effective Date, the Debtor shall assume the following leases, as defined in the Disclosure Statement:

(a) Galleria Lease;

(b) Security System Lease; and

(c) Postage Meter Lease.

On the Effective Date, the Debtor shall reject the following leases, as defined in the Disclosure Statement:

(a) Audi Lease;

(b) Mercedes Lease; and

(c) Copier Lease.

The Debtor rejects all other unexpired leases and executory contracts except to the extent that they may have been assumed previously in the Chapter 11 Case.

ARTICLE VIII

CONTESTED CLAIMS

8.1 No payment shall be made under the Plan with respect to a Disputed Claim, unless estimated by the Court for such purposes, until the Disputed Claim becomes an Allowed Claim, by agreement of the parties to any Claim disputed or by Final Order of the Court. As soon as

practicable after the Allowed Claim is established by agreement or Final Order, Debtor shall pay to the holder of such Allowed Claim pursuant to the Plan.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

### 9.1 Modification of the Plan.

Debtor may amend or modify this Plan in the manner provided for under Bankruptcy Code § 1127 (a) or (b). Debtor shall give notice of any proposed modification to Counsel for the Committee and to the United States Trustee and to any other parties designated by the Court. Debtor also reserves the right to make such modifications at any hearings on confirmation as are necessary to permit this Plan to be confirmed under Bankruptcy Code § 1129(b).

### 9.2 Revesting, Security Interests and Liens.

Except as otherwise expressly provided in the Plan, as of the Effective Date, the Debtor shall be restored to its full ownership of and dominion over all property owned by the Debtor, all property of the estate, and all property dealt with by the Plan. The property so vested in the Debtor shall be free and clear of all claims, liens, encumbrances, charges and/or other interests of holders of claims or interests except as otherwise provided in the Plan.

On or after the Effective Date of the Plan, the Debtor may freely operate its business, and may freely use, acquire, and dispose of property of the estate and property of the Debtor, except as otherwise provided in the Plan. Except as may be otherwise expressly provided by the Plan, the Debtor's operation of its business and use of property shall be free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or any prior Bankruptcy Court order entered during the bankruptcy case.

### 9.3 Release and Discharge of the Debtor.

As of the Effective Date, the rights afforded in the Plan shall be in exchange for and in complete settlement, satisfaction, payment, cancellation, discharge and release of all Claims and interests of any nature whatsoever against the Debtor or any of its assets or properties or its interests therein, and all holders of Claims shall be precluded from asserting against the Debtor, its assets or properties, any other or further claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date except as provided in the Plan. The release shall be effective as to each Claim or interest, regardless of whether a proof of claim or proof of interest therefor was filed, whether the Claim is an Allowed Claim, or whether the holder thereof votes to accept the Plan.

### 9.4 Objections to Claims.

Objections to Claims may be filed with the Court and served upon each holder of such Claim to which objection is made within the time specified by the Court in the Order confirming the Plan.

## ARTICLE X

## RETENTION OF JURISDICTION

The Court shall retain jurisdiction of the Chapter 11 Case for the following purposes:

A. To determine all controversies relating to or concerning the classification, allowance or satisfaction of Claims or interests as well as objections thereto;

B. To determine all causes of actions between Debtor and any other party including, but not limited to, any right of Debtor to recover assets pursuant to the provisions of the Bankruptcy Code;

C. To determine any and all applications for compensation for professional and similar fees;

D. To determine the allowance of Claims for damages from the rejection of executory contracts or unexpired leases;

E. To determine any and all applications, adversary proceedings, and contested or litigated matters properly before the Court;

F. To liquidate all disputed, contingent or unliquidated Claims;

G. To modify the Plan pursuant to Section 9.1 of the Plan or to remedy any defect of omission or reconcile any inconsistencies in the Plan or Confirmation Order to the extent authorized by the Code;

H. To make such orders as are necessary or appropriate to carry out the provisions of the Plan; and

I. To shorten or extend, for cause, of any time fixed for doing any act or thing under this Plan; entry of any Order, including any injunction, necessary to enforce the title, rights, and powers of Debtor; and entry of an Order concluding and terminating this case. The Court may exercise its jurisdiction after notice and hearing or *ex parte*, as the Court determines to be appropriate.

Dated: October 25, 2010                           SCHEHERAZADE, INC.

                                                  Scott H. Rudd, President

17